**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **DANA SARGENT BERRY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | Civil Action No.  3:11-CV–02817-L (BH) |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to *Special Order No. 3-251*, this case was automatically referred for findings of fact

and recommendation.  Before the Court are *Plaintiff's Motion for Summary Judgment*, filed March

8, 2012 (doc. 12) and *Defendant's Motion for Summary Judgment*, filed April 9, 2012 (doc. 13).

Based on the relevant filings, evidence, and applicable law, Plaintiff's motion should be **DENIED**,

Defendant's motion should be **GRANTED**, and the final decision of the Commissioner should be

wholly **AFFIRMED**.

**I.  BACKGROUND**[1]

**A.**     **Procedural History**

Dana Berry (Plaintiff) seeks judicial review of a final decision by the Commissioner of

Social Security (Commissioner) that she was disabled beginning on October 28, 2009.  (R. at 16.)

Plaintiff applied for disability insurance benefits and supplemental security income benefits under

---

[1]     The background information comes from the record of the administrative proceedings, which is
designated as "R."

Titles II and XVI of the Social Security Act on February 12, 2007, alleging disability due to depression, migraines, insulin-dependent diabetes, neck and hand problems, liver damage, and diverticulitis, beginning September 7, 2005. (R. at 187–89, 195–97, 223.) Her application was denied initially and upon reconsideration. (R. at 115–19.) She requested a hearing before an Administrative Law Judge (ALJ) and personally appeared and testified at a hearing held on April 15, 2008. (R. at 90.) On April 1, 2009, the ALJ issued his decision finding Plaintiff not disabled. (R. at 87–99.) After she requested review of the ALJ's decision, the Appeals Council found that the administrative record was incomplete and remanded her claim for a new hearing and decision. (R. at 101–03.) She appeared and testified at a second hearing held on April 14, 2010. (R. at 36–78.) On May 27, 2010, the ALJ issued his decision finding Plaintiff was disabled beginning on October 28, 2009. (R. at 11–29.) She requested review by the Appeals Council to the extent that the ALJ found her not disabled between her alleged onset date of September 7, 2005 and October 27, 2009. (R. at 8.) The Appeals Council denied her request for review on August 25, 2011, making the ALJ's decision the final decision of the Commissioner. (R. at 1–6.) She timely appealed to the United States District Court pursuant to 42 U.S.C. § 405(g). (doc. 12.)

**B.    Factual History**

**1.    Age, Education, and Work Experience**

Plaintiff was born on August 6, 1958. (R. at 187.) At the time of the hearing before the ALJ, she was 51 years old. (R. at 42.) She graduated high school and subsequently enrolled in college, but completed only two years. (R. at 43.) Her past relevant work is as an accounting clerk for 15 years. (R. at 69.)

## 2. Medical, Psychological, and Psychiatric Evidence

### a. Medical Evidence

Plaintiff's relevant medical evidence began on September 12, 2005, when she presented to Shannon West Texas Memorial Hospital (SWTMH), for back pain after a fall. (R. at 450.) X-rays of her cervical spine revealed "post operative changes ... at C4-C5 and C5-C6 ... and moderate narrowing of the C6-C7 disk space," but were "otherwise unremarkable." (*Id.*) X-rays of her chest and shoulders revealed "no acute abnormality." (R. at 451–52.)

On February 8, 2006, Dr. Charles Benham of SWTMH examined Plaintiff for an injury to her right ankle and right knee. (R. at 455.) He noted tenderness in her right foot, ankle, and knee, and ordered X-rays. (*Id.*) The X-rays of her knee showed a "normal alignment," there was "no fracture or focal bone lesion," and the "[j]oint space widths [were] well preserved." (R. at 460.) The impression was a "[s]mall joint effusion with no evidence of acute osseous abnormality." (*Id.*) X-rays of her ankle did not reveal any fracture, subluxation, or dislocation. (R. at 461.) She was "alert" and in "no acute distress" during the examination, but her speech was "slurred," she was "unable to find all her words," seemed "depressed," and reported she had "stressors related to [her] family and financial situation." (R. at 455–56, 458.) She tested positive for "cocaine" and "opiates" in a blood analysis test. (R. at 466.)

On February 20, 2006, Plaintiff visited Dr. Peter Chang, her family physician at Shannon Clinic, complaining of pain in her right knee due to a fall two weeks earlier. (R. at 384.) An examination of her head, ears, eyes, nose, and throat (HEENT examination) was "unremarkable." (*Id.*) Dr. Chang noted she had tenderness in her knee and a limited range of motion, and he prescribed Lortab and Soma for her pain. (*Id.*)

On June 25, 2006, Plaintiff was seen for abdominal pain. (R. at 385, 470.) A CT scan of her abdomen and pelvis "did not reveal any significant abnormality." (R. at 470.) Although she was alert and did "not [appear to be] terribly ill," she was hospitalized for further evaluation. (R. at 471.) Three days later, Dr. Chang diagnosed her with "severe abdominal pain with spontaneous passage of ureteral stone, questionable diverticulitis–not substantiated, insulin-dependent diabetes mellitus, history of pancreatitis, and chronic depression," and discharged her with instructions to increase her fluid intake. (R. at 469.) He instructed her to increase her fluid intake but did not prescribe her any new medications. (*Id.*)

Between July 13 and July 17, 2006, Plaintiff was again hospitalized due to severe right flank abdominal pain. (R. at 392–96, 508–14.) On July 16, 2006, Chris Cole, M.D., reviewed a CT scan of her pelvis and found "[n]o acute abnormality." (R. at 508.) All other tests were negative. (R. at 396.) Dr. Cole's final diagnoses were "abdominal pain, etiology unknown," and "elevated liver function tests without obvious etiology." (*Id.*)

On September 21, 2006, Plaintiff visited Dr. Chang, "primarily for [a] disability evaluation." (R. at 397.) She reported struggling with severe depression and feeling "fatigued and run down." (*Id.*) Dr. Chang diagnosed her with severe depression and lower back pain with muscle spasm and completed a disability form. (*Id.*) She returned the following month, complaining of migraine headaches, fatigue, and "just feeling poorly." (R. at 398.) Dr. Chang diagnosed her with migraine headaches and prescribed her Phenergan and Stadol. (*Id.*)

On September 28, 2006, Plaintiff returned to SWTMH, complaining of tongue swelling and "acute facial spasms" due to an allergic reaction. (R. at 515–20.) The examining physician noted that she was depressed and anxious, and he prescribed her Ativan "as needed for anxiety." (R. at

515, 518.)

On December 3, 2006, Plaintiff reported a "sharp" pain in her back. (R. at 521–34.) Lisa Murphy, M.D., examined her and prescribed her medication for pain and muscle spasm. (R. at 521, 524.) Plaintiff returned on December 29, 2006, complaining of back pain, and was prescribed pain medication. (R. at 530.) She was seen again on January 19, 2007, when she reported severe abdominal pain, diarrhea, nausea, vomiting, and blood streaks in her stool. (R. at 535–42.) On January 30, 2007, she was examined for mild pain in her neck, back, and shoulders due to injuries she suffered in a recent car accident. (R. at 544.) X-rays of her cervical spine revealed "[p]ost surgical change from C4 to C6" and "loss of cervical lordosis," but were otherwise normal. (R. at 548.) X-rays of her chest were also normal. (R. at 549.) The examining physician prescribed her a muscle relaxant and pain medication, and released her the same day. (R. at 545–47.)

On February 27, 2007, Plaintiff was again hospitalized at SWTMH because she was experiencing severe chest pain, a "severe headache, and dizziness." (R. at 399, 552–68, 606–07.) A physical examination was unremarkable, and blood and cardiac enzyme tests were all negative. (R. at 399–400.) Doctors diagnosed her with non-cardiac chest pain, insulin-dependent diabetes mellitus, severe migraine, and history of diverticulitis. (R. at 606.)

On March 8, 2007, Plaintiff reported moderate radiating pain in her lower back after "cleaning a carport." (R. at 609–18.) She returned on March 31, 2007, stating that she "fell out of bed." (R. at 627.) X-rays of her left hip showed a normal alignment and "no evidence of inflammatory arthritis," "significant degenerative disease," or an "acute abnormality." (R. at 623.) The impressions of her pelvis were likewise unremarkable, and X-rays of her lumbar spine revealed

"[d]egenerative changes ... in the lumbar discs and facet joints," but were otherwise normal.  (R. at 625.)  She returned twice in April 2007, complaining of migraine headaches.  (R. at 635, 759–65.)

On April 18, 2007, Plaintiff returned to Dr. Chang "for [a] medication evaluation."  (R. at 827.)  He noted that overall, she was "doing pretty fair," but "still [had] a fair amount of low back pain and muscle spasm."  (*Id.*)  He diagnosed her with "low back pain with muscle spasm" and "sinusitis," and refilled her medications.  (*Id.*)  On July 3, 2007, Dr. Chang wrote a disability letter stating that Plaintiff "ha[d] been under [his] care for several years", and that she was medically disabled due to her severe back and knee pain, diabetes, and migraine headaches.  (R. at 828.)

On May 13, 2007, Plaintiff returned to SWTMH, complaining of lower back pain and a sinus congestion.  (R. at 658–69.)  X-rays of her lumbar spine showed a normal alignment, and revealed "no fracture or focal bone lesion," no "significant degenerative change," and "[n]o soft tissue abnormality."  (R. at 662.)  On May 16, 2007, she was treated for "urinary retention" and "elevated creatine."  (R. at 687.)  X-rays of her chest taken on May 17, 2007 revealed "[n]o acute cardiac or pulmonary abnormality."  (R. at 730.)  Between June 29, 2007 and December 2, 2008, she was treated for various ailments, including urinary tract infections, difficulty sleeping, migraine headaches, cough, sore throat, fever, and sinusitis.  (R. at 689–767.)

On May 11, 2007, a state agency medical consultant (SAMC) reviewed Plaintiff's medical evidence and completed a physical RFC assessment.  (R. at 597–604.)  The SAMC opined that she had the following physical RFC: lift and carry 50 pounds occasionally and 25 pounds frequently; stand, walk, and sit for about six hours in an eight-hour workday; push and pull an unlimited amount of weight; no postural, manipulative, visual, communicative, or environmental limitations. (R. at 598–601.)  He concluded that her "alleged limitations" were "not wholly supported" by the evidence

of record. (R. at 602.) He commented that her physical examinations in January and February 2007 were "essentially normal" and showed "no acute abnormality." (R. at 604.)

On August 7, 2007, Plaintiff told Dr. Chang that she continued to struggle with depression, she had "numbness in the hands and feet," and overall, she "just [did] not feel well." (R. at 802–03.) Her "older sister [had] recently died in a motor vehicle accident," and she had "other domestic crises." (R. at 803.) He diagnosed her with "osteoarthritis of the hands" and "endogenous depression," prescribed her Celebrex 200, and gave her samples of Cymbalta. (R. at 802–03.)

On February 12, 2008, Plaintiff saw Dr. Chang "for a medication refill." (R. at 801.) She told him that she was "currently seeing a psychologist who ha[d] suggested [she] might be bipolar," and "she [felt] like there [were] times she [had] to drink alcohol to suppress her emotional lability [*sic*]." (*Id.*) He noted that overall, she was "doing well," diagnosed her with "bipolar disorder," and prescribed her Lithobid and Motrin 800. (*Id.*)

On April 7, 2008, Plaintiff complained of "restless leg symptoms" to Dr. Chang. (R. at 800.) She also told him that she was "interested in filing for disability" because she "just ha[d] difficulty working and just [felt] really tired and run down." (*Id.*) He diagnosed her with restless leg syndrome, type II diabetes mellitus, fatigue, and fibromyalgia. (*Id.*) He completed a disability form indicating that Plaintiff suffered from major depression with symptoms of "anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, decreased energy, and difficulty concentrating or thinking." (R. at 804-06.) She had marked restrictions in her activities of daily living and maintaining social functioning; deficiencies of concentration, persistence, or pace; and had experienced repeated episodes of deterioration or decompensation in work or work-like settings. (*Id.*) He further indicated that she was markedly impaired in seven

work-related abilities, including the ability to carry out very short and simple instructions; was moderately impaired in eight abilities, including the ability to work with others without being distracted by them; and was not significantly impaired in five abilities. (R. at 804–05.)

Plaintiff returned to Dr. Chang on October 3, 2008, complaining of fatigue, headaches, pain behind both thighs, and feeling "really tired and run down." (R. at 834.) She told him that she had "recently lost her father." (*Id.*) He diagnosed her with "endogenous depression" and "severe low back pain," and prescribed her medication. (*Id.*) She returned on December 3, 2008, for "a follow up on her depression." (R. at 835.) Dr. Chang noted that she was "doing pretty well" overall, but "still ha[d] a fair amount of back pain," "fe[lt] really tired and run down," had [a] "low energy level," and was "not sleeping well." (*Id.*) He administered a B12 injection and refilled her Cymbalta. (*Id.*)

On January 1, 2009, Plaintiff presented to SWTMH with a "severe headache" after an "altercation with [her] brother." (R. at 974.) A CT scan of her head showed "[s]inus inflammatory disease," but was "otherwise unremarkable." (*Id.*) Dr. Cole, the examining physician, prescribed her Vicodin for her pain. (R. at 976.)

On April 16, 2009, Dr. Chang submitted another disability letter. (R. at 836.) He stated that Plaintiff had been under his care "for several years," and he had treated her "for chronic back pain [and] severe depression." (*Id.*) He opined that she was "presently not able to work primarily because of her severe incapacity and back pain." (*Id.*)

On April 20, 2009, Plaintiff saw Dr. Chang "for a follow up on her disability." (R. at 837.) Dr. Chang noted that she was "doing pretty fair," but continued "to have a fair amount of back pain and ... [was] not able to work at th[at] time." (*Id.*) He diagnosed her with "chronic back pain with

muscle spasm," but "kept [her] on her current medications." (*Id.*) By July 20, 2009, she was experiencing "abdominal pain, nausea, and vomiting." (R. at 838.) An HEENT was "unremarkable," and Dr. Chang diagnosed her with "abdominal pain unknown etiology." (*Id.*)

On May 6, 2009, SWTMH physician Roland Heidenhofer, M.D., diagnosed Plaintiff with cephalgia, migraine, pharyngitis, and viral syndrome. (R. at 958–59.) He prescribed medication and ed her with instructions to increase her fluid intake and follow up with Dr. Chang. (R. at 959.)

On September 5, 2009, Plaintiff was again hospitalized at SWTMH due to chest pains, "severe tremor shakes," and a "possible anxiety attack." (R. at 882–900.) A CT scan of her head was "negative for acute intracranial hemorrhage or other acute intracranial abnormalities." (R. at 888.) MRI impressions showed no acute abnormality, and an electroencephalogram (EEG) test was likewise normal. (R. at 890, 901, 952.)

On October 28, 2009, O. Martin Franklin, D.O., a consultative medical examiner, examined Plaintiff and completed an internal medicine evaluation. (R. at 853–56.) Plaintiff's chief complaints were bilateral carpal tunnel syndrome, cervical spine discomfort, liver disease, and diabetes. (R. at 853.) He noted she "ha[d] cervical surgery at C5-C6" 15 years earlier, and she continued to "ha[ve] neck stiffness and pain going down to both shoulders and spine." (*Id.*) She told him that despite her carpal tunnel syndrome surgery, her symptoms had been "worsening over the past four years." (*Id.*) Additionally, "her neck, hands, wrists, back, hips, knees, and feet hurt mostly all the time." (*Id.*)

Dr. Franklin found that Plaintiff could stand for only 30 minutes and could sit for only 45 minutes without having to change positions. (R. at 854.) She was unable to heel-to-toe walk or rise from a squatting position; she dragged her right foot when she walked and had an unsteady gait; and

had decreased pin prick and vibratory sensation in her hands. (R. at 856.) She was depressed but alert and oriented to person, place, and time; had no ideations; and her gross mental status was normal. (*Id.*) His "diagnostic impressions" were bilateral carpal tunnel syndrome with history of surgery and continued pain; history of cervical spine surgery and cervical radiculitis; history of liver disease secondary to Tylenol overdose; insulin-dependent diabetes mellitus; cerebrovascular accident with right side weakness; and obesity. (*Id.*)

Dr. Franklin ordered X-rays of Plaintiff's cervical spine, which, when compared with those from January 30, 2007, revealed "[s]table postoperative ACDF procedure changes extending from C4 through C6," and "[s]table prominent narrowing of the C6-C7 disk space with hypertrophic spurring noted anteriorly and posteriorly." (R. at 858.)

On November 2, 2009, Plaintiff returned to SWTMH, complaining of pain in her legs and hips, and she was diagnosed with "lumbosacral strain." (R. at 873–78.) She returned on November 12, 2009, again complaining of pain in her legs and of a severe headache. (R. at 861–68.) Harold Paul Freemyer, M.D., examined her and noted that her speech was slurred and she could "barely sit up on her own." (R. at 861.) A CT scan of her head showed "[n]o acute intracranial abnormality." (R. at 864.) She tested positive for "opiates" in a blood analysis test. (R. at 867.)

### b. *Psychological and Psychiatric Evidence*

On May 2, 2007, William A. Montgomery, Ph.D., a licensed clinical psychologist and consultative examiner, evaluated Plaintiff and completed a mental status report. (R. at 571–78.) He noted that she was "appropriately dressed and groomed," but also "very depressed and frequently cried during [the] evaluation." (R. at 571.) He reviewed her medical history and noted she was hospitalized for psychiatric treatment several times between 1992 and August 2004. (*Id.*) "She

reported using Prozac for the past year and believe[d] she [was] coping better with her depression as a result." (*Id.*)

Plaintiff was able to bathe, dress, and groom herself, although some days she did not "want to do it." (R. at 573.) She could do household chores, cooked about once a month, and drove to her parents' house about three times per month. (*Id.*) Her parents paid her bills, and although she was able to handle money, she had "no money to handle." (*Id.*) She had no hobbies or interests, and spent a typical day "watching TV, sleeping, walking around the house, and checking on [her] parents." (*Id.*) She had no close friends and interacted only with her parents, but could "relate fine with other people." (*Id.*)

Plaintiff had difficulty completing tasks because she would "just lose interest." (*Id.*) When asked how she dealt with stress, she replied, "I keep it bottle[d] up inside me." (*Id.*) Both of her surviving siblings were treated for depression, and her brother and a niece had recently attempted suicide. (R. at 573–74.) She was sexually abused by her maternal grandfather from age six until age twelve. (R. at 574.) She "receiv[ed] outpatient counseling for several years in the past," and found it "very helpful," but she could no longer afford it. (*Id.*) When she applied for free counseling services at "MHMR," she was turned away due to lack of space. (*Id.*) She had used alcohol and amphetamine in the past, but denied any current use. (*Id.*)

Dr. Montgomery found that Plaintiff's behavior and activity level were "unremarkable," she "made fair eye contact," "spoke clearly," and "was cooperative and responsive." (R. at 575.) She "expressed herself in a clear manner, and no disturbances were noted in her form of thought." (*Id.*) She had "daily thoughts of harming herself," and had previously attempted suicide. (*Id.*) She did not think of harming others, and had no delusions. (*Id.*) She had recurrent memories of her abuse,

had nightmares about once a month, and experienced occasional flashbacks. (*Id.*)

Plaintiff was in a "very depressed mood ... and ... cried frequently." (*Id.*) She dealt with depression her life, had difficulty sleeping, had no appetite, and had "very little energy." (*Id.*) She described herself as "worthless," and her outlook on her future as "hopeless." (R. at 576.) Dr. Montgomery noted that she was "alert and well oriented," "her remote memories were intact," her judgment had no significant deficits, and she "seemed to have some insight into the possible causes of her ... depression." (*Id.*) Her "recent memory was significantly impaired," and her "immediate memory was also impaired." (*Id.*)

Dr. Montgomery diagnosed Plaintiff with "major depressive disorder, recurrent, severe without psychotic features," and "post-traumatic stress disorder, chronic" and assigned her a Global Assessment of Functioning (GAF) score of 50.[2] (*Id.*) He opined that her depression "might improve" with counseling and psychotropic medications, and "encouraged her to again seek treatment through MHMR." (R. at 577.)

On May 10, 2007, Ralph Robinowitz , Ph.D., an SAMC, completed a Psychiatric Review Technique Form (PRTF) and a mental Residual Functional Capacity (RFC) assessment. (R. at 579–96.) In his PRFT, he found that Plaintiff had a mild restriction in her activities of daily living; had moderate difficulties in social functioning and in maintaining concentration, persistence, or pace; and had experienced no episodes of decompensation. (R. at 589.) Referencing Dr. Montgomery's observations, he concluded that her alleged symptoms were not wholly supported by the record. (R. at 591.)

---

[2] A GAF score of 41 to 50 indicates "serious symptoms," such as suicidal ideations, or "any serious impairment in social, occupational, or school functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 34 (4th ed., text rev. 2000).

In his mental RFC assessment, Dr. Robinowitz opined that Plaintiff was not significantly limited in eleven categories, including her ability to understand and remember very short and simple instructions; was moderately limited in seven categories, including her ability to maintain attention and concentration for extended periods; and was markedly limited in her ability to understand, remember, and carry out detailed instructions. (R. at 593–95.) He concluded that she "retain[ed] the ability to understand, remember, and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately [with] co-workers and supervisors, [and] respond appropriately to changes in a routine work setting." (R. at 595.)

Between October 10, 2007 and April 3, 2008, Plaintiff received nine counseling sessions from Linda Curtis, M.Ed., L.P.C., a licensed counselor. (R. at 794–98.) At the first session, Ms. Curtis diagnosed her with "major depressive disorder." (R. at 798.) On April 11, 2008, Ms. Curtis submitted a disability letter. (R. at 794.) She stated that Plaintiff had a "long history of mental health issues," had attempted suicide in the past, and also had "a long history of drug abuse, but reported [being] clean since 1992." (*Id.*) Ms. Curtis opined that Plaintiff "should qualify for disability," and explained that she "often [went] without medical treatment" because "of her inability to work." (*Id.*)

On September 29, 2009, Carlos Escobar, M.D., a consultative examiner, interviewed Plaintiff and completed a psychiatric evaluation. (R. at 840.) Plaintiff told him that she took Cymbalta for her depression and was also prescribed Ativan, Lithium, and Zoloft, but she could not afford them. (*Id.*) "Cymbalta [was] helpful to her since she ha[d] not experienced severe depression," and it kept her "from being suicidal or getting more depressed." (*Id.*) She was independent in her daily living activities and could mobilize without orthopedic devices. (R. at 842.) She was not involved in

church or any social group, did not got out much, and had no hobbies. (*Id.*) She spent most of the time at home by herself doing household chores, including "washing dishes, cleaning the house as much as she [could], and doing light cooking." (*Id.*)

In his mental status examination, Dr. Escobar noted that Plaintiff "appeared to be calm, awake, and alert, oriented to person, time, and location." (*Id.*) His notes relate the following: "[n]o lethargy," "[i]ntelligence average," "[s]peech is goal-oriented," "[s]he made eye contact and was cordial and polite during the examination," "[h]er mood was described as chronically depressed, although [her] medication seems to help," "[t]hought content shows no signs of psychosis, no paranoia." (*Id.*) He assigned her a GAF score of 45, diagnosed her with "recurrent major depressive disorder, in partial remission," and noted that she had several "stressors and environmental problems," including unemployment and financial hardships, chronic physical and mental illness, the inability to return to work, marital failure, and the lack of a support system. (R. at 843.)

### 3.    Hearing Testimony

On February 3, 2010, Plaintiff and a vocational expert testified at a hearing before the ALJ. (R. at 24–48.) Plaintiff was represented by an attorney. (*See id.*)

#### a.    *Plaintiff's Testimony*

Plaintiff testified that she was 51 years old, divorced, and living with a roommate. (R. at 42–43, 47.) She completed the 12th grade and two years of college. (R. at 43.) Her last job was working for Verizon in accounts payable. (*Id.*) She stopped working there because she "had a hard time leaving [her] house," "got real paranoid," "didn't want to be around [her] co-workers," "didn't feel comfortable," and "just couldn't stand it." (*Id.*) She was diagnosed with diabetes before leaving her job and was only working half days because her blood sugar "fluctuate[d]." (R. at 43–44.)

Plaintiff did not believe she was able to work in a "competitive full time job" because of her paranoia and because she did not like to socialize with others. (R. at 44.) She felt "[e]xtremely sad and down" and felt like getting out of bed "maybe five days a month." (*Id.*) She spent a typical day sitting on the couch, not doing anything, not even thinking. (*Id.*) It was "too hard"; if she thought "about having to do something, then [she] start[ed] dwelling on it days and days ahead and it ma[de] her sick." (R. at 45.)

Plaintiff took medication for her depression and received counseling in the past but could no longer afford it. (*Id.*) She had no health insurance, and her dad had "helped [her] financially" until he passed away. (R. at 45–46.) She went to the emergency room for medical treatment. (R. at 46.) She had a migraine headache about once a month that made her feel nauseous and "like [her] head [was] going to explode." (*Id.*) She was prescribed Imitrex but could not afford it. (*Id.*)

Plaintiff felt "numbness and tingling in [her] feet ... continuously." (R. at 47.) Her symptoms were especially severe in her hands, and worsened at night. (*Id.*) She had carpal tunnel syndrome surgery, but it did not relieve her symptoms. (*Id.*) It was very difficult for her to engage in activities that required "fine manipulation, such as sewing or picking up coins off a table." (*Id.*) She had difficulty walking and would "get sores." (*Id.*) Her roommate did most of the grocery shopping, cooking, and cleaning. (*Id.*)

Plaintiff weighed 178 pounds, which was not her normal weight. (R. at 48.) She gained weight because she did not "eat properly," and would eat more than she was supposed to when she was bored. (*Id.*) She took additional anti-anxiety medication when she left the house and never went out unaccompanied. (R. at 49.) She went to bed around 11 p.m., but would only sleep for a couple of hours. (*Id.*) When she was awake, she thought about her family and her "brain ... [would

not] let [her] silence it to sleep." (R. at 50.) She had thoughts of suicide and had attempted suicide three years earlier. (*Id.*) The last time she had those thoughts, she called her counselor. (*Id.*)

Plaintiff had pain in her lower back and hip area. (R. at 51.) Whenever she stood for too long, she felt "shooting pains up [her] back," and if she sat down for very long, her hip area would also hurt. (*Id.*) On a ten-point scale, her back pain was about a seven or eight. (*Id.*) The Lortab helped ease her pain, but did not relieve it completely. (R. at 52.) She could not sit for more than 30 minutes without switching positions or standing up. (*Id.*) The most she could stand before needing a break was 15 minutes. (R. at 53.) She had pain in her knee about six days a week and wore a knee brace. (R. at 53–54.) She could not walk for more than one block. (R. at 54.)

Plaintiff's children visited her and sometimes called her on the phone. (R. at 54.) She did not have any close friends and did not attend church. (*Id.*) Her antidepressants caused her "kidney problems," and she did not want to drive when she took her anxiety medication because she felt like she was "not coherent enough." (R. at 55.) She could not focus for a very long time, was "constantly worried about what's going on," and her "mind [would not] stop long enough for [her] to concentrate on one thing." (R. at 56.) She took insulin for her diabetes and took all her other medications as regularly as she could. (R. at 57.) If her blood sugar dropped or rose too much, she got a "double" vision and became depressed and unable to concentrate. (R. at 58.)

On examination by the ALJ, Plaintiff testified that she began having problems with her hands when she was still working for Verizon. (*Id.*) Even after she had carpal tunnel surgery, her symptoms worsened to the point that the numbness in her hands awakened her at night. (R. at 59.) She reported these problems to Dr. Chang after her surgery, but she could not remember when that was. (R. at 60.) She began experiencing back pain in 2007 or 2008. (R. at 61.) She remembered

falling down at home, but was not sure if that accident was the cause of her pain. (*Id.*) She got into physical altercations with her roommate and had a car accident, but she could not remember specific dates. (*Id.*) Of all her health problems, her depression and paranoia were the most severe. (R. at 62.) Although she had suffered from paranoia in the past, it worsened with her family problems, including her divorce and her father's illness and subsequent death. (R. at 62–63.)

Plaintiff stated in her 2009 disability report that she could do household chores, including washing dishes and going grocery shopping, but she could not do those things anymore by the time of the hearing. (R. at 63.) She took Cymbalta and Lithium every day, and she took Lorazepam, Clonazepan, and Lortab when she could afford them, and only when she went out in public. (R. at 64.) She was last hospitalized in November of 2009. (R. at 65.) She tested positive for "opiates," and she believed that it was due to her Lortab. (R. at 66.) The ALJ asked Plaintiff if she remembered going to the emergency room in 2011 because she hurt her back moving bookshelves, but Plaintiff did not remember. (R. at 66.)

On re-direct examination, Plaintiff testified that she could not tell whether her medications helped ease her symptoms because she still suffered from paranoia and could not even be around her three children at once. (R. at 68.) She went to the doctor in September 2009 because she had trouble moving her foot and right hand, and the doctors told her she had suffered a mild stroke. (*Id.*) That same month, she was hospitalized for three days because she appeared to be having either seizures or a panic attack, and she had several more seizures after that. (R. at 68–69.)

### b.    *Vocational Expert testimony*

A vocational expert (VE) also testified at the hearing. (R. at 69–76.) The VE testified that Plaintiff's past work history consisted of her job as an accounting clerk, (sedentary, skilled, SVP-5).

(R. at 69.)  The ALJ asked the VE to opine whether a hypothetical person of Plaintiff's age, education, and work experience could perform her past relevant work with the following limitations: lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for about six hours in an eight-hour workday; no climbing of scaffolds, ropes, or ladders; occasionally climb ramps and stairs; occasional balancing, kneeling, crouching, crawling, and stopping; frequent reaching, handling, fingering, and feeling bilaterally, but not constantly; no visual, communicational, or environmental limitations, except for not working around hazardous moving machinery or unprotected heights; the ability to understand, remember, and carry out only short, simple instructions, in a simple and routine work environment; make judgments only on simple work-related decisions; incidental contact with the public and co-workers; and occasional contact with supervisors.  (R. at 70.)

The VE opined that the hypothetical person could not perform Plaintiff's past relevant work. (*Id.*)  She testified that the hypothetical person could perform other work such as cleaner/housekeeper (light, SVP-2), with 30,000 jobs in Texas and 400,000 jobs in the national economy; conveyor line tender (light, SVP-1), with 1,200 jobs in Texas and 25,000 jobs in the national economy; and routing clerk (light, SVP-2), with 2,000 jobs in Texas and 27,000 in the national economy.  (R. at 71.)  When the ALJ modified the hypothetical to include the ability to handle and finger bilaterally occasionally instead of frequently, the VE testified that the hypothetical person could still perform the conveyor line tender job, but not the routing clerk or housekeeper/cleaner jobs.  (R. at 72.)  She testified that the individual could also perform work as a machine tender (light), with 3,000 jobs in Texas and 40,000 in the national economy.  (R. at 73.)

In response to counsel's questions, the VE provided the DOT numbers for the occupations

she had previously identified, explained how she estimated the numbers of available jobs, and clarified that they were full-time positions. (R. at 73–74.) When counsel modified the hypothetical to include the ability to stand or walk for four hours with the assistance of a knee brace, the VE testified that it would eliminate the job of cleaner/housekeeper and reduce the numbers of the other three jobs by "two-thirds." (R. at 75.) Counsel modified the hypothetical again to include moderate limitations in the ability to (1) complete a normal workday because of interruptions from psychologically-based symptoms; (2) perform at a consistent pace without unreasonable rest periods (in number and length); (3) respond appropriately to changes in the work setting; (4) perform activities within a schedule; (5) maintain a regular attendance; and (6) be punctual within customary tolerances. (R. at 76.) In response, the VE testified that the hypothetical person could not maintain employment at a competitive level. (*Id.*)

C.    **ALJ's Findings**

The ALJ issued his decision denying benefits on May 27, 2010. (R. at 16–29.) At step one, he found that Plaintiff met the insured status requirements through December 31, 2010, and had not engaged in substantial gainful activity since her alleged onset date of September 7, 2005. (R. at 18.) At step two, he found that Plaintiff had the following severe impairments: diabetes, major depressive disorder, migraine headaches, and bilateral carpal tunnel syndrome. (*Id.*) Despite those impairments, at step three, he found that no impairment or combination of Plaintiff's impairments satisfied the criteria of any impairment listed in the social security regulations. (R. at 19.)

The ALJ next determined that between September 7, 2005 and October 28, 2009, Plaintiff had the physical RFC over a sustained period of time to: lift and carry (including upward pulling) 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for about six hours in an

eight-hour workday; not climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs; occasionally balance, kneel, crouch, crawl, and stoop; occasionally handle and finger with the bilateral hands/arms; and not work around hazardous moving machinery or unprotected heights; with no visual or communicative limitations. (R. at 19.) Plaintiff had the ability to understand, remember, and carry out short, simple instructions in a simple and routine work environment; make judgments on only simple work-related decisions; and respond appropriately to usual work pressures and changes in the work setting, in jobs requiring only incidental contact with co-workers and the public, and only occasional contact with supervisors. (*Id.*) The ALJ determined at step four that Plaintiff was unable to perform any of her past relevant work. (R. at 26.) At step five, with the testimony of the VE, the ALJ determined that there were jobs existing in significant numbers in the national economy that Plaintiff could perform during this period, such as conveyor line tender, with 1,200 jobs in Texas and 25,000 in the national economy, and machine tender, with 3,000 jobs in Texas and 40,000 in the national economy. (R. at 26–27.) Accordingly, he determined that Plaintiff was not disabled between September 7, 2005, and October 28, 2009. (R. at 26.)

For the period beginning on October 28, 2009, the ALJ determined that Plaintiff retained the RFC to perform work-related physical and mental activities for substantially less than a regular and continuing basis. (R. at 27.) At step four, he determined that beginning on October 28, 2009, she was unable to perform her past relevant work. (*Id.*) At step five, he determined that her medically determinable impairments prevented her from performing work existing in significant numbers in the national economy. (*Id.*) Accordingly, the ALJ determined that Plaintiff was under a disability, as defined in the Social Security Act, from October 28, 2009 through the date of the ALJ's decision. (R. at 28.)

## II.  ANALYSIS

## A.  <u>Legal Standards</u>

### 1.  Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  42 U.S.C. § 405(g), 1383(C)(3); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *See id*.  The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision.  *See id*.

## 2. Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis

terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.    Issues for Review**

Plaintiff presents the following issues for review:

(1)    The ALJ Failed To Adequately Consider [Plaintiff's] Onset Date;

(2)    The ALJ Failed to Follow the Treating Physician Rule;

(3)    The ALJ Failed to Properly Evaluate [Plaintiff's] Credibility; [and]

(4)    The ALJ Relied Upon Flawed Vocational Expert Testimony.

(Pl. Br. at 11, 14, 21, 23.)

**C.    Plaintiff's Onset Date**

Plaintiff argues that remand is required because the ALJ erred in determining the onset date of her disability. (Pl. Br. at 11–14.) She contends that the ALJ arbitrarily decided that her disabling limitations "suddenly began" on the date of Dr. Franklin's examination, and that he failed to explain why those limitations "did not apply at any time prior to [that] date." (Pl. Br. at 13–14.) She further contends that the ALJ failed to give any "deference" to her alleged onset date without providing an adequate explanation, and that he improperly discounted medical evidence that supported her alleged

limitations during the period at issue.  (Pl. Br. at 12–13.)

"The onset date of disability is the first day [a claimant] is disabled as defined in the Act and the regulations."  *Titles II and XVI: Onset of Disability*, Social Security Ruling (SSR) 83–20, 1983 WL 31249, at *1 (S.S.A. 1983).  "SSR 83-20 prescribes the policy and procedure" for determining the onset date.  *Spellman v. Shalala*, 1 F.3d 357, 361 (5th Cir. 1993)  If the impairment is of traumatic origin, the onset date "is the day of the injury."  SSR 83–20, 1983 WL 31249, at *2.  If it is of non-traumatic origin, that is, if it is a "progressive" impairment, three factors must be considered: "the individual's allegations, the work history, and the medical evidence."  *Spellman*, 1 F.3d at 361.  Although the starting point is the "claimant's allegation as to when the disability began,  ... and the date that his disability caused him to stop work[ing] is often very significant," "the medical evidence is the primary element."  *Id.*  (citing SSR 83-20, 1983 WL 31249, at *2).

With respect to slowly progressive impairments, such as diabetes and depression,[3] "it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling," and the onset date must therefore be inferred.  SSR 83-20, 1983 WL 31249, at *2.  The claimant's alleged onset date is adopted "if it is consistent with all the evidence available."  SSR 83-20, 1983 WL 31249, at *3; *accord Spellman*, 1 F.3d at 361.  If not, "additional development may be needed to reconcile the discrepancy."  SSR 83-20, 1983 WL 31249, at *3.  "How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical

---

[3]    Plaintiff suffers from diabetes mellitus and major depressive disorder.  (R. at 18.)  These conditions have been recognized by courts as being "slowly progressive impairments."  *See Spellman*, 1 F.3 at 361; *Baumgartner v. Astrue*, No. 3-09-CV-2357-BD, 2011 WL 1159400, at *3 (N.D. Tex. Mar. 28, 2011).

basis." *Id; see also Spellman,* 1 F.3d at 363–64 (finding that because the medical evidence was "ambiguous" due to the gap in the record, the onset date established by the Appeals Council was "arbitrary" and not based on a "legitimate medical basis" since "nothing in the record suggested that [the date chosen] was significant with regard to [the claimant's] disability" and remanding with instructions to "consult a medical advisor in redetermining the onset date of [the claimant's] disability").

The Fifth Circuit has not yet determined whether an ALJ may reject a claimant's stated onset date and select a later date where the medical evidence sufficiently demonstrates the advancement of his or her slowly progressive impairment.[4] In a different context, however, it has held that an ALJ may reject a claimant's alleged onset date "if [his] reasons are articulated and the reasons given are supported by substantial evidence." *Loza v. Apfel*, 219 F.3d 378, 394 (5th Cir. 2000) (citing *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990) and *Spellman*, 1 F.3d at 361). Ultimately, the ALJ should set the onset date as "the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the [claimant] from [working]" and should give "[c]onvincing rationale ... for the date selected." SSR 83-20, 1983 WL 31249, at *3.

Here, based on a relatively complete medical chronology of Plaintiff's impairments, the ALJ found that her alleged onset date of September 7, 2005 was inconsistent with the medical evidence. (*See* R. at 25–27.) From the medical evidence, he determined that between September 7, 2005 and

_____

[4] *Spellman* did distinguish the facts before it from those in *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). 1 F.3d at 362, n. 8. In *Pugh*, the Seventh Circuit held that substantial evidence supported the ALJ's finding that the onset of the claimant's disability was over three years after the date he alleged where the ALJ's determination was based on "a relatively complete medical chronology of [the claimant's] medical condition." 870 F.2d at 1273, 1278–79 & n. 9; *see also McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 428 (6th Cir. 2006) (unpublished) (holding that substantial evidence supported the ALJ's determination that the claimant's onset date was over four years after his alleged date where the ALJ "developed and carefully reviewed" the medical record).

October 28, 2009, she had the RFC to perform light work with several physical and mental limitations. (R. 19–26, 28.) In determining her physical RFC during this period, the ALJ considered her diabetes and acknowledged that she was "insulin-dependent." (R. at 20.) He noted that despite her allegation of neck pain after falling from a bed in September 2005, X-rays revealed "no acute findings." (R. at 20, 445–50.) Likewise, while she alleged having pain in her right knee after falling in February 2006, X-rays showed "only a small joint effusion." (R. at 20, 460.)

The ALJ accepted Plaintiff's alleged diagnosis of migraine headaches in November 2006 and diverticulitis in January 2007, but pointed to physical and neurological examinations conducted in February 2007 that "were essentially normal." (R. at 20, 398–400, 572.) In March 2007, Plaintiff was again treated for lower back pain, but X-rays of her lumbo-sacral spine indicated "only minor degenerative changes." (R. at 20, 613,755.) He also found it significant that despite her "fair amount" of lower back pain in April 2007, Dr. Chang opined that she was "doing pretty fair" overall. (R. at 21, 827.) He considered the SAMC's opinion in May 2007 that Plaintiff retained the physical RFC to perform a full range of medium work. (R. at 26.)

The ALJ found that Plaintiff's daily activities in March 2007 "were substantially greater than that to which she testified at [the] hearing," and he noted that she was still independent in her daily activities in April and September of 2009. (R. at 20–21, 301–09, 842.) While not determinative, a claimant's capacity to engage in a wide variety of daily activities can be properly considered in assessing disability. *See Anthony v. Sullivan,* 954 F.2d 289, 296 (5th Cir. 1992).

The ALJ found Plaintiff's hospitalization in September 2009 to be significant, as well her allegations of "tremors, shakes, shortness of breath, and chest pain." (R. at 21.) He noted that when Plaintiff complained of having numbness in her hands and feet in October 2007, Dr. Chang

diagnosed "only osteoarthritis," and "offered no specific treatment"; by October 28, 2009, she had decreased pin prick and vibratory sensation in her hands. (R. at 28.)

The ALJ acknowledged Plaintiff's complaints to Dr. Franklin that she had "near-constant pain in her neck, hands, wrists, back, hips, knees, and feet" on October 28, 2009. (R. at 27.) He accepted Dr. Franklin's observations that "she dragged her right foot" when she walked and "had an unsteady gait," could stand for only 30 minutes and sit for 45 minutes without changing positions, and could walk for only one block. (R. at 28, 856.) He noted that the X-rays taken on that date showed a "narrowing of the C6-C7 disk space" in Plaintiff's cervical spine. (R. at 28.)

With respect to Plaintiff's mental RFC, the ALJ considered Plaintiff's statements to Dr. Montgomery in May 2007, "that her depression had improved with medication during the previous year." (R. at 21, 572.) He gave great weight to Dr. Montgomery's assessment of a "relatively high" GAF score of 50 and his prognosis that Plaintiff's "symptoms might improve with counseling." (R. at 21, 577.) He noted her statement to Ms. Curtis in April 2008 that her anti-depressant was "keeping her on an even keel," and her statements to Dr. Escobar in September 2009 that her antidepressant "was helpful," "she had not experienced severe depression," and "she had not seen a psychiatrist for quite a long time." (R. at 21–22, 795, 840–43.)

The ALJ articulated his reasons for rejecting Plaintiff's alleged onset date and gave a convincing rationale for selecting October 28, 2009 as the onset date of her disability. Even though the medical evidence showed that Plaintiff suffered from several impairments during the period at issue, substantial evidence supports the ALJ's conclusion that these impairments did not become sufficiently severe as to prevent her from working until October 28, 2009. *See Halterman ex rel. Halterman v. Astrue*, No. CIV.A. 11-0630, 2012 WL 3764051, at *11 (W.D. La. July 20, 2012),

*report and recommendation adopted*, 2012 WL 3762470 (W.D. La. Aug. 29, 2012) (holding that

although the "evidence was not uniform and could have supported a different [RFC]," substantial

evidence supported the ALJ's finding that the claimant was able to work between his alleged onset

date and the onset date established by the ALJ); *see also Jones v. Astrue*, No. CIV.3:09CV590, 2010

WL 2306151, at *2 (E.D. Va. June 3, 2010)*, aff'd sub nom. Jones v. Comm'r of Soc. Sec.*, 414 F.

App'x 532 (4th Cir. 2011) (holding that substantial evidence supported the ALJ's selection of "the

date of a consultative examination" as the claimant's onset date where "the medical record presented

clear evidence documenting the progression of [the claimant's] condition," and the examination

"marked the first time a physician opined that [the claimant] had such limitations as to ultimately

render him disabled"); *but see Durden v. Astrue*, No. 4:07-CV-865, 2008 WL 8053430, at *7 (S.D.

Tex. Jan. 29, 2008) (finding that "[a]lthough the ALJ did not choose the onset date out of thin air,

it [did] not correspond to any particular date in the progression of [the claimant's] impairment," but

corresponded "only to the date that [a physician] signed [a] medical source statement").

The record shows that substantial evidence supports the ALJ's determination of Plaintiff's

onset date, and remand is therefore not required on this issue.

### D.    Treating Physician Rule

Plaintiff next argues that remand is required because the ALJ improperly rejected Dr.

Chang's and Ms. Curtis's treating opinions without employing the six-factor analysis found in 20

C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).  (Pl. Br. at 14, 18.)[5]

---

[5]  In this section of her brief, Plaintiff also argues that the ALJ erred in rejecting consultative examiner Dr. Escobar's GAF score of 45 and in "fail[ing] to indicate what weight, if any, was given to the consistent findings from ... [consultative examiner] Dr. Montgomery."  (Pl. Br. at 19.)  She further argues that the ALJ "failed to cite any specific evidence" to support his RFC findings.  (*Id.* at 20.)  These issues are separate and do not relate to the treating physician rule, but they not listed in the "Issues Presented" section or separately briefed as expressly

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. §§ 404.1520b(b) and 404.1527(c) (2012). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. 20 C.F.R. § 404.1527(c)(2); *Newton*, 209 F.3d at 455. If controlling weight is not given to a treating source's opinion, the Commissioner applies six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(c)(1)–(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ.

---

required by the Court's February 10, 2012 Scheduling Order, and are therefore deemed abandoned. (*See* doc. 10 at 1.) Even if considered, these issues would not affect the outcome because, as previously discussed, the ALJ based his RFC assessment on specific medical evidence, including Dr. Escobar's and Dr. Montgomery's consultative examinations, and substantial evidence supports his conclusion that Plaintiff had the RFC to engage in substantial gainful activity during the period at issue. (*See* R. at 21–22.)

*Newton*, 209 F.3d at 455. If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 455–56. Ordinarily, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453 (emphasis in original). A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

### 1.   *Dr. Chang's Opinions*

Plaintiff argues that the ALJ improperly rejected Dr. Chang's opinions without employing the six-factor analysis, and that this error "was highly prejudicial" to her claim because every factor weighed in favor of crediting Dr. Chang's opinions. (Pl. Br. at 16.)

In assessing Plaintiff's RFC during the period at issue, the ALJ considered Dr. Chang's opinion in July 2007 that Plaintiff was disabled because of her severe pain and limited stamina, but gave it "very limited probative value" because he found it to be inconsistent other medical evidence, including Dr. Chang's own treatment record. (R. at 21.) It contradicted his finding in April 2007 that Plaintiff was doing "pretty fair," despite her lower back pain and muscle spasms and medical

records from SWTMH showing she had "only mild back and knee impairments." (R. at 21, 460, 622, 827.)

The ALJ considered Dr. Chang's mental evaluation from April 2008, but rejected his conclusions that Plaintiff had marked limitations in her ability to understand, remember, and carry out even short and simple instructions, in her activities of daily living, and in social functioning. (R. at 23.) These conclusions conflicted with the mental RFC findings of Dr. Robinowitz, a state agency psychological consultant, that Plaintiff retained the ability to understand, remember, and carry out simple instructions, make simple decisions, attend and concentrate for extended periods, and interact adequately with co-workers and supervisors. (R. at 23, 593–95.) They were also at odds with Plaintiff's statements to Dr. Escobar, a consultative examiner, that she was independent in her activities of daily living and did household chores, as well as with the fact that she "exhibited no limitations in her memory and concentration" during the September 2009 consultation. (R. at 23, 842.) Dr. Chang's conclusions were further "discredited" by Plaintiff's statement to Dr. Montgomery, another consultative examiner, that she "related fine with others" in May 2007. (R. at 23, 573.) Lastly, the ALJ rejected Dr. Chang's opinion from April 2009 that Plaintiff was disabled due to severe back and knee pain, finding that his opinion conflicted with his conservative treatment record and with Plaintiff's ability to handle her personal care and engage in daily activities during that time. (R. at 21.)

The ALJ was entitled to reject Dr. Chang's conclusions that Plaintiff was disabled because a determination of disability is not a medical opinion, but rather a legal conclusion that is reserved to the Commissioner. 20 C.F.R. § 404.1527(e); *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003). He could also reject Dr. Chang's opinions about her allegedly disabling back pain without

performing a factor by factor analysis because there was competing first-hand medical evidence, including Dr. Chang's own treatment record, that supported a contrary conclusion. *Newton*, 209 F.3d at 455. Finally, it was proper for the ALJ to give greater weight to Dr. Robinowitz's mental RFC findings than to Dr. Chang's opinions regarding Plaintiff's mental limitations because the ALJ may accept a consulting physician's opinion that is well-supported over a treating physician's opinion. *See Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981) (holding that the ALJ "was justified in accepting the opinion of [a non-treating, consultative physician] ... that was supported by the evidence, and in rejecting the [opinion] of ... a treating physician that was contrary to the evidence") (citing to 20 C.F.R. § 404.1526). The ALJ's decision to give little weight to Chang's opinions was not erroneous and is supported by substantial evidence in the record.

### 2. Ms. Curtis's Opinion

Plaintiff also argues that the ALJ erred by rejecting Ms. Curtis's opinion concerning her mental disability without first performing a factor by factor analysis. (Pl. Br. at 18.)

The ALJ acknowledged, but gave "very limited probative value", to Ms. Curtis's opinion that Plaintiff should qualify for mental disability, finding that it was inconsistent with a remark she made that same month that her new medication was "keeping her on an even keel." (R. at 21, 795.) The ALJ was entitled to reject Ms. Curtis's disability opinion because that determination is solely within the purview of the ALJ. 20 C.F.R. § 404.1527(e); *Frank*, 326 F.3d at 620. Moreover, as a licensed counselor, Ms. Curtis was not an "acceptable medical source." *See* 20 C.F.R. § 404.1513(d) (providing a non-exhaustive list of non-medical sources, which includes "therapists" and "counselors"). Ms. Curtis's opinion was therefore not a "medical opinion", and it could not be used to establish the existence of a medically determinable impairment. *See* 20 C.F.R. § 404.1527(a)(2)

("Medical opinions are statements from physicians and psychologists or other acceptable medical sources ...."); 20 C.F.R. § 416.913(a) (providing that only "evidence from acceptable medical sources" is used to determine whether the claimant has "a medically determinable impairment"). Although the ALJ was required to consider Ms. Curtis's opinion, along with all the other evidence, he was not required to give it any weight or analyze it using the six-factor test. *See Hayes v. Astrue*, No. 3:11-CV-1998-L, 2012 WL 4442411, at * (N.D. Tex. Sept. 26, 2012); SSR 06-03R, 2006 WL 2329939, at *4 (S.S.A. 2006). Lastly, as the trier of fact, the ALJ was free to decide whether Ms. Curtis's opinion was supported by the record. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) (per curiam); *see also Newton*, 209 F.3d at 452 ("Conflicts in the evidence are for the [ALJ] ... to resolve.").

The ALJ's rejection of Dr. Chang's and Ms. Curtis's opinions is supported by substantial evidence, and remand is therefore not required on this issue.

## E.    Credibility

Plaintiff next contends that the ALJ failed to properly evaluate her credibility and failed to give an adequate explanation for rejecting her subjective complaints. (Pl. Br. at 21–22.)

Credibility determinations by an ALJ are entitled to deference. *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991). The ALJ is in the best position to assess a claimant's credibility because he "enjoys the benefit of perceiving first-hand the claimant at the hearing." *Falco v. Shalala*, 27 F.3d 160, 164 n.18 (5th Cir. 1994). In evaluating a claimant's subjective complaints, the ALJ must follow a two-step process. SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996). First, the ALJ must determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* Next, the ALJ must evaluate

the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities. *Id.* If the claimant's statements concerning the intensity, persistence, or limiting effects of those symptoms are not substantiated by objective medical evidence, the ALJ must assess the credibility of the claimant's statements. *Id.*; *Falco*, 27 F.3d at 164 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648–49 (5th Cir. 1985)).

In assessing credibility, the ALJ must consider the entire record, including medical signs and laboratory findings and statements by the claimant and his treating or examining sources concerning the alleged symptoms and their effects. SSR 96-7p, 1996 WL 374186, at *2. The regulations provide a non-exhaustive list of factors that the ALJ must consider. *See* 20 C.F.R. § 404.1529(c) (2011).[6] The Fifth Circuit has held that the ALJ is not required to follow "formalistic rules" in assessing credibility, and he must articulate his reasons for rejecting a claimant's subjective complaints only "when the evidence clearly favors the claimant." *Falco*, 27 F.3d at 163.

Ultimately, the mere existence of pain is not an automatic ground for disability, and subjective evidence of pain does not take precedence over conflicting medical evidence. *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989) (citations omitted). An individual's statements regarding pain and other symptoms alone are not conclusive evidence of a disability and must be supported by objective medical evidence of a medical impairment that could reasonably be expected to produce the pain or other symptoms alleged. 42 U.S.C. § 423(d)(5)(a).

---

[6] These factors are: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; (6) measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c); SSR 96-7p, 1996 WL 374186, at *3.

Here, the ALJ "considered all [of Plaintiff's] symptoms and the extent to which [they] [could] reasonably be accepted as consistent with the objective medical evidence and other evidence. (R. at 20.) He first stated that her credibility was "called into question by a previous conviction for passing checks with insufficient funds" and by her medical "noncompliance." (R. at 25.) He found inconsistencies between Plaintiff's testimony and other evidence in the record, including her previous statements. (R. at 18–25.) For instance, at the first hearing, she testified that she was fired from Verizon "for showing up late," but at the second hearing she testified that she stopped working due to her paranoia and inability to einteract with others. (R. at 18, 43.) While she alleged having knee problems, she wrote that she exercised on a treadmill in her February 22, 2007 disability report. (R. at 25, 232.) In her disability application, she stated that "her impairments affect[ed] her ability to drive," but she was "capable of ... driving a motor vehicle to Mexico" in 2008. (R. at 25, 795.)

The ALJ emphasized that despite Plaintiff's allegations of having constant pain in her neck, lower back, and right knee, X-ray impressions consistently revealed either "no acute findings" or "only minor degenerative changes." (R. at 20–21, 451, 455–60, 625.) She alleged not being able to work due to her pain, but in April 2009, her daily activities included preparing meals, performing household chores, and shopping for groceries. (R. at 21.) By September 2009, she was still "able to carry out her daily activities by herself." (R. at 22.) Finally, nothing in the record supported her testimony that she had "substantial vision problems." (R. at 25.)

The ALJ was not required to articulate his reasons for rejecting Plaintiff's subjective allegations because the evidence as a whole did not "clearly favor" her. Although not in a formalistic fashion, he considered the factors for assessing credibility and relied on substantial evidence, including objective medical findings and Plaintiff's own statements, to support his

credibility determination. He gave specific reasons for his conclusion that her alleged symptoms had "no substantial effect on her ability to work" beyond his RFC assessment. (R. at 25.) Because substantial evidence supports the ALJ's credibility finding, remand is not required on this issue.

**E.** **Flawed VE Testimony**

Plaintiff last argues that the ALJ relied on flawed VE testimony in making his disability determination because the testimony was produced in response to an improper hypothetical question that did not include all of her disabilities "borne out of the record." (Pl. Br. at 23.) She also argues that the ALJ erred by failing to specifically include in his hypothetical her limitations in three of the four functional areas listed in 20 C.F.R. §§ 404.1520a and 416.920a. (*Id.* at 24.)

To establish that work exists for a claimant at steps four and five of the sequential disability determination process, the ALJ relies on the medical-vocational guidelines or the testimony of a VE in response to a hypothetical question. *See Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). A hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question. *Id*. at 436. A claimant's failure to point out deficiencies in a hypothetical question does not "automatically salvage that hypothetical as a proper basis for a determination of non-disability." *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001). If the ALJ relies on testimony elicited by a defective hypothetical question in making a disability determination, the Commissioner does not carry his burden of proof to show that a claimant could perform available work despite an impairment. *Id*. at 708.

Here, the ALJ presented a hypothetical question to the VE asking whether work existed for an individual with Plaintiff's age, education, and work experience who could do the following:

lifting and carrying 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for about six hours in an eight-hour workday; no climbing of scaffolds, ropes, or ladders; occasionally climb ramps and stairs; occasional balancing, kneeling, crouching, crawling, and stooping; frequent reaching, handling, fingering, and feeling bilaterally, but not constant; no visual or communicational limitations; no environmental limitations, except for not working around hazardous moving machinery or unprotected heights; ability to understand, remember, and carry out only short, simple instructions, in a simple and routine work environment; make judgments only on simple work-related [decisions]; incidental contact with the public and co-workers; and occasional contact with supervisors.

(R. at 70.)  The VE testified that such a person could not perform Plaintiff's past relevant work, but could perform the jobs of cleaner/housekeeper, conveyor line tender, and routing clerk.  (R. at 71.)  The ALJ then modified the hypothetical to include the ability to "occasionally handle and finger bilaterally."  (R. at 72.)  The VE testified that such a person could still perform the job of conveyor line tender and could also perform the job of machine tender.  (R. at 72–73.)

The modified hypothetical question by the ALJ reasonably incorporated all of the limitations that he recognized in his RFC assessment and that were supported by the record.  *See Masterson v. Barnhart*, 309 F.3d 267, 273 (5th Cir. 2002) (upholding ALJ's hypothetical question when it scrupulously incorporated all of the claimant's disabilities supported by evidence and recognized by the ALJ).  The ALJ properly rejected the VE's testimony that an individual with the additional limitations listed by counsel would be unable to work at a competitive level because he was not bound by VE testimony based upon evidentiary assumptions that he ultimately rejected.  *See Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985).

Plaintiff acknowledges that the ALJ's hypothetical incorporated all the limitations he "recognized," but contends that he committed reversible error by not explicitly including her mild limitations in activities of daily living and moderate limitations in social functioning and in

maintaining concentration, persistence, and pace that he found under 20 C.F.R. §§ 404.1520a and 416.920a.[7]  (Pl. Br. at 23–24.)

Courts in this district have held that the ALJ is not required to explicitly include the claimant's functional limitations found in paragraph B in his hypothetical to the VE, as long as these limitations are adequately incorporated into the RFC, and the hypothetical "tracks" the RFC.  *See, e.g.*, *Halterman*, 2012 WL 3764051, at *10; *Barr v. Astrue*, No. 311-CV-1349-BF, 2012 WL 2358307, at *6 (N.D. Tex. June 21, 2012); *Herring v. Astrue*, 788 F. Supp. 2d 513, 518–19 (N.D. Tex.  Apr. 22, 2011); *Gipson v. Astrue,* No. 3:10-CV-1413-BK, 2011 WL 540299 at *6–7 (N.D. Tex. Feb.11, 2011).  The Court agrees with this approach.  The functional limitations found in paragraph B are simply used to rate the severity of the claimant's mental impairments at steps 2 and 3.  SSR 96-8P, 1996 WL 374184, at *3 (S.S.A. July 2, 1996).  The mental RFC assessment requires a more detailed analysis in which the ALJ itemizes the paragraph B limitations and expresses them in terms of work-related functions, including "the abilities to understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers, and work situations; and deal with changes in a routine work setting."  *See id.* at *3–6.  Although the ALJ must consider the claimant's "paragraph B" functional limitations when determining the mental RFC, he is not required to incorporate them into his RFC assessment "word-for-word."  *Westover*, 2012 WL 6553102, at *8; *Owen v. Astrue*, No. 3:10-CV-1439-BH, 2011 WL 588048, at *20 (N.D. Tex. Feb. 9, 2011).  At later steps, when determining whether work exists for

---

[7]  If a claimant has a mental impairment, at steps two and three, the ALJ "must ... evaluate the degree of functional loss resulting from the impairment in four separate areas deemed essential for work."  *Boyd*, 239 F.3d at 705 (citing 20 C.F.R. § 404.1520a(b)(3)).  These functional areas (known as the "paragraph B criteria") are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation.  20 C.F.R. § 404.1520a(c)(3) (2011); 20 C.F.R. Pt. 404, Subpt. P. App. 1, § 12.00C.

the claimant, the ALJ's hypothetical question to a VE must only "reasonably" incorporate the claimant's disabilities that the ALJ recognized in his RFC assessment and are supported by the record. *See Bowling*, 36 F.3d at 436; *Halterman*, 2012 WL 3764051, at *10. Because the ALJ is not required to incorporate verbatim the paragraph B limitations into his RFC assessment, he should not be required to incorporate them verbatim into his hypothetical to the VE—as long as he accounts for them in his RFC assessment.

Here, at steps two and three, in considering the paragraph B criteria, the ALJ determined that Plaintiff had "only a mild limitation" in her activities of daily living and "only moderate limitations" in social functioning and maintaining concentration, persistence, or pace. (R. at 22–23.) He next determined that between September 7, 2005 and October 28, 2009, she had the mental RFC to understand, remember, and carry out short, simple instructions in a simple and routine work environment; make judgments on only simple work-related decisions; and respond appropriately to usual work pressures and changes in the work setting, in jobs requiring only incidental contact with co-workers and the public, and only occasional contact with supervisors. (R. at 19.) At step five, with the testimony of the VE, the ALJ concluded that Plaintiff had the physical and mental RFC to perform certain jobs existing in significant numbers in the national economy during the period at issue. (*See* R. at 26–27.)

In determining Plaintiff's mental RFC during the period at issue, the ALJ explained that his assessment "reflect[ed] [the] nonexertional limitations" he found under paragraph B. (R. at 23.) He considered Plaintiff's statements that her medication helped relieve her depression, she was independent in her daily activities, she performed household chores, was capable of living alone, and was independent in her personal grooming. (R. at 21–22.) He gave weight to her statement to

Dr. Montgomery that she "ha[d] no difficulties getting along with others." (R. at 22–23.) He also adopted the opinion of Dr. Robinowitz, an SAMC, that she could interact adequately with co-workers and supervisors, but the ALJ included greater social functioning restrictions in his RFC assessment by limiting Plaintiff to only incidental contact with co-workers and the public and only occasional contact with supervisors. (R. at 19, 26.)

The ALJ accepted Dr. Montgomery's consultative opinions that Plaintiff's immediate and recent memories were significantly impaired, her remote memory was intact, and "her attention and concentration were adequate." (R. at 23, 576.) He pointed to Dr. Escobar's consultative evaluation, noting Plaintiff exhibited no limitations in her memory or concentration. (R. at 23, 842.) He implicitly adopted Dr. Robinowitz's mental RFC findings that she had marked limitations in her ability to understand, remember, and carry out detailed instructions, but retained the ability to understand, remember, and carry out simple instructions, make simple decisions, and attend and concentrate for extended periods. (R. at 19, 593–95.) In his RFC assessment, the ALJ included an additional mental restriction, limiting Plaintiff to a simple and routine work environment. (R. at 19.)

The ALJ's decision shows that he considered and incorporated Plaintiff's functional limitations he found in paragraph B into his mental RFC assessment, and substantial evidence supports his assessment. The ALJ's hypothetical to the VE reasonably incorporated her functional limitations because it "tracked" his RFC assessment. (*See* R. at 70, 72.) Accordingly, the ALJ committed no reversible error. *See Bordelon v. Astrue*, 281 Fed. App'x 418, 422–23 (5th Cir. 2008) (per curiam) (finding no reversible error where the ALJ's RFC assessment and resulting hypothetical "reasonably incorporated" the claimant's moderate limitation in concentration, persistence and pace by restricting him "to rare public interaction, low stress, and one-to-two step instructions," and

noting that the claimant "failed to show any prejudice arising from the hypothetical question's omission of her [limitation]"); *Herring*, 788 F. Supp. 2d at 519–20 (finding "no reversible error" where substantial evidence supported the ALJ's RFC implicit finding that the claimant's "social limitations were sufficiently moderate, for [him] to respond appropriately to supervision [and] coworkers" and the hypothetical tracked the RFC); *compare Eastham v. Comm'r of Soc. Sec. Admin.*, No. 3:10-CV-2001-L, 2012 WL 691893, at *9 (N.D. Tex. Feb. 17, 2012), *report and recommendation adopted*, 2012 WL 696756 (N.D. Tex. Mar. 5, 2012) (remanding because the court found that the ALJ's RFC assessment and resulting hypothetical, which restricted the claimant to "simple, routine work," failed to reasonably incorporate his "moderate limitations with respect to concentration, persistence, and pace").

The ALJ committed no reversible error in presenting his hypothetical to the VE. Substantial evidence therefore supports his finding at step five that Plaintiff could perform work that existed in significant numbers in the national economy between September 7, 2005 and October 28, 2009. Accordingly, remand is not required on this issue.

## III.    RECOMMENDATION

Plaintiff's motion for summary judgment should be **DENIED**, Defendant's motion for summary judgment should be **GRANTED**, and the final decision of the Commissioner should be wholly **AFFIRMED**.

**SO RECOMMENDED, on this 25th day of January, 2013.**

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

# INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE